UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION NO. __________________

LOIS BREECH, by and through her
Attorney-in-Fact, CB LUSHER PLAINTIFF

v. **COMPLAINT**

KNOTT COUNTY NURSING HOME, INC.
d/b/a KNOTT COUNTY HEALTH AND
REHABILITATION CENTER
and SEKY HOLDING CO. DEFENDANTS

---

Comes now the Plaintiff, Lois Breech, by and through her Attorney-in-Fact, C.B. Lusher, by counsel, and for her Complaint against Defendants Knott County Nursing Home, Inc. doing business as Knott County Health & Rehabilitation Center and Seky Holding Co. (collectively, "Defe ndants" or the "Facility"), states as follows:

## I. INTRODUCTION

1. This is a civil action arising from Defendants' unlawful refusal and discharge of Lois Breech ("Ms. Breech"), an incapacitated 88-year-old resident, from Knott County Health & Rehabilitation Center (the "Facility") on August 22, 2025, and Defendants' subsequent failure ever to provide the notice, justification, or lawful process for her exclusion required by the Facility's own admission agreement, Kentucky's Long-Term Care Residents' Rights Act, and federal nursing home transfer-and-discharge regulations. Additionally,

Plaintiff brings claims for abuse, neglect, conversion, negligent and intentional infliction of emotional distress," patient dumping," outrageous conduct and deprivation of necessary services.

2. Rather than follow the narrow, legally prescribed grounds and procedures for transferring or discharging a resident, or bed-hold procedures, Defendants simply refused her access to the Facility after a hospital admission.

3. Plaintiff's grandson, CB Lusher, returned Ms. Breech to the Facility after a hospital admission on August 25, 2205. When Mr. Lusher physically brought Ms. Breech to the Facility's entrance doors, Facility staff refused to unlock the doors, saying the denial of access was on the Facility Administrator's direct instruction. Defendants thereafter refused Ms. Breech and Mr. Lusher access to her prescribed medications, feeding tube supplies, thickener, and personal belongings, including her personal wheelchair, notwithstanding that her stay had already been paid for. The Defendants then refused, for weeks, to respond to Mr. Lusher's repeated written demands, including a demand expressly invoking the governing federal regulation regarding discharge procedures, for a straightforward answer as to whether she would be readmitted. In fact, Ms. Breech was never readmitted and was never given a reason by the Defendants for the denial of access or conversion of Ms. Breech's medications and personal property.

4. Compounding these events, in the days immediately preceding this exclusion, Defendants' own nursing staff failed for approximately two days to timely address Ms. Breech's dislodged PEG feeding tube notwithstanding two failed bedside attempts to correct it, leaving her without adequate nutritional support and in physical pain and, upon information and belief, requiring more invasive medical intervention than would otherwise have been necessary. Despite knowledge of the dislodged feeding tube, the Defendants failed to notify Mr. Lusher of this condition. A Facility nursing supervisor later acknowledged, in a conversation with Mr. Lusher, that this failure "does not make it okay whatsoever."

5. During Ms. Breech's five-month residency preceding this incident, her grandson and Attorney-in-Fact, C.B. Lusher, had repeatedly and reasonably engaged with Facility staff

regarding her care, including a documented history of falls, unexplained injuries, pressure ulcers, and recurrent infections, as described in Section IV.A below. That documented history establishes that Mr. Lusher's vigilance and persistence were reasonable and necessary responses to real, recurring problems in Ms. Breech's care and not, as Defendants may contend, unreasonable interference on his part.

6. Plaintiff brings this action for negligence arising from Defendants' mismanagement of Ms. Breech's dislodged feeding tube, wrongful lockout and actual or constructive discharge from the Facility in violation of the Kentucky Long-Term Care Residents' Rights Act (KRS 216.515) and 42 C.F.R. § 483.15, breach of contract, conversion, intentional infliction of emotional distress, negligent infliction of emotional distress, physical and mental abuse, deprivation of necessary services, "patient dumping," and punitive damages.

## II. PARTIES

7. Plaintiff Lois Breech is a natural person who, at all times relevant hereto, was and is a citizen and domiciliary of the State of West Virginia, having resided in Huntington, Cabell County, West Virginia, prior to and independent of her temporary placement at the Facility for skilled nursing care.

8. Ms. Breech is 89 years old and, due to cognitive and physical impairments, is incapacitated and unable to manage her own affairs or prosecute this action in her own right.

9. C.B. Lusher is Ms. Breech's grandson and the duly appointed Attorney-in-Fact and responsible party for Ms. Breech, and brings this action on her behalf in that representative capacity pursuant to a Durable Power of Attorney executed by Ms. Breech on September 3, 2008, and acknowledged before a notary public in Cabell County, West Virginia, which expressly grants Mr. Lusher, among other enumerated powers, the authority to "commence, prosecute, discontinue, or defend all actions or other legal proceedings" affecting Ms. Breech or her property "before any administrative body, local, state, federal, or international court." Mr. Lusher is a citizen of the State of West Virginia, residing in Huntington, Cabell County, West Virginia.

10. Defendant Knott County Nursing Home, Inc. doing business as Knott County Health & Rehabilitation Center, (the "Facility"), is a corporation or limited liability company organized and existing under the laws of the Commonwealth of Kentucky, with its principal office located at 200 South Kentucky Street. P O Box 1450, Corbin, KY 40702, and operating a licensed long-term care facility located at 388 Perkins Madden Road, Hindman, Knott County, Kentucky 41822. The registered agent for service of process for Defendant Knott County Nursing Home is CT Corporation System, 306 West Main Street, Suite 512, Frankfort, KY 40601.

11. Defendant Seky Holding Co. is a corporation or limited liability company organized and existing under the laws of the Commonwealth of Kentucky, with its principal place of business located at at 200 South Kentucky Street. P O Box 1450, Corbin, KY 40702, Kentucky, and is, upon information and belief, the owner and/or operator of the Facility, responsible in whole or in part for its staffing, budgeting, policies, and administration. The registered agent for service of process for Defendant Seky Holding Co., is CT Corporation System, 306 West Main Street, Suite 512, Frankfort, KY 40601.

12. At all times relevant hereto, Defendants, and each of them, owned, operated, managed, controlled, and/or were responsible for the day-to-day operations, staffing, admission, transfer, and discharge decisions, and billing practices of the Facility.

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiff, a citizen of the State of West Virginia, and each Defendant, each of whom is, upon information and belief, a citizen of the Commonwealth of Kentucky, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims herein occurred in Knott County, Kentucky, within this judicial district.

15. Venue is proper in the London Division of this Court because Knott County, Kentucky, is assigned to the London Division of the United States District Court for the Eastern District of Kentucky.

## IV. FACTUAL BACKGROUND

### *A. Mr. Lusher's Documented, Reasonable Engagement with Ms. Breech's Care*

16. Ms. Breech, then 88 years old, was admitted to the Facility on March 18, 2025. Her grandson, C.B. Lusher, held a Power of Attorney for Ms. Breech and was her responsible party, entitled to be kept informed of, and to participate in decisions regarding, her care.

17. Throughout Ms. Breech's residency, Facility records document, among other things: at least five separate falls (March 21, April 28, May 12, May 22, and June 1, 2025), none witnessed by nursing staff at the moment they occurred; a thirteen-day hospitalization in April 2025 during which Ms. Breech was diagnosed with RSV pneumonia, upon information and belief acquired during an RSV outbreak at the Facility; an unexplained episode of bilateral leg and foot bruising on May 18, 2025 with no documented cause; a Stage II pressure ulcer to her buttock and an unstageable pressure ulcer to her right great toe, first documented June 11 and July 28, 2025, respectively; an 8.1% unintended weight loss in five weeks following admission; and recurrent urinary tract infections between March and August 2025, involving multiple pathogens, some multi-drug-resistant.

18. Given this documented history, Mr. Lusher appropriately and repeatedly engaged with Facility staff and administration, requesting safety interventions such as a bed alarm, requesting diagnostic imaging, requesting medication changes, arranging and paying for a private sitter during a period in June and July 2025 when he was recovering from his own surgery and unable to visit as often, and, ultimately, insisting that Ms. Breech be hospitalized for her RSV pneumonia after the Facility's provider initially tried to refuse sending her to the hospital -- a course of treatment that appeared inadequate and that, once she was hospitalized, in fact required thirteen days of inpatient care.

19. This history is alleged solely to establish that Mr. Lusher's engagement with the Facility was a reasonable and necessary response to real, recurring, and documented problems in

Ms. Breech's care, and to rebut any contention by Defendants that the events described below resulted from him being unreasonably demanding of Facility staff or resources. Plaintiff does not assert, and this Complaint should not be read to assert, any independent claim or count based on the falls, weight loss, or other conditions described in this subsection; they are pled as background context only. The claims for relief set out in Sections V through XII below arise from the distinct events described in Sections IV.B through IV.G.

### *B. The August 17-22, 2025 PEG Tube Failure and Antibiotic Crisis*

20. The Facility's own records show that Ms. Breech's PEG feeding tube first became dislodged no later than August 17, 2025. A nursing note authored by Crystal Sergeant, RN (effective August 17, 2025 at 19:32) states that staff found Ms. Breech had pulled out her G-tube and made an unsuccessful attempt to replace it, and that staff elected to notify the physician "in early am" rather than treat the open stoma as an emergency, because, in the author's words, this was "not being an emergent procedure."

21. A second attempt to replace the tube, on August 18, 2025 at approximately 19:00, also failed, with Ms. Breech recorded as combative and unable to cooperate with the procedure. A separate nursing note timestamped August 18, 2025 at 22:36 likewise documents that "[r]esident pulled out feeding tube on dayshift."

22. Notwithstanding these repeated, documented failed attempts to replace the tube beginning August 17, 2025, Facility records do not reflect that staff inserted a temporary catheter or similar device to preserve the patency of the stoma between attempts, arranged emergency transport, or notified Mr. Lusher at any point between August 17 and the afternoon of August 19, 2025, despite his role as her responsible party and Power of Attorney.

23. On the afternoon of August 19, 2025, Mr. Lusher -- present at the Facility at the time -- discovered gastric contents on Ms. Breech's clothing after she had eaten lunch in the dining room, and asked Facility staff to accompany him to her room. Rachel Honeycutt, a Facility nursing employee, thereafter documented (effective time 13:27) that staff had discovered the gastric contents; in fact, Facility staff either became aware of the issue only after Mr. Lusher identified it to them, or were aware of the condition, ignoring it and secreting it

from Mr. Lusher. Mr. Lusher requested that Ms. Breech be taken to Whitesburg ARH Hospital for tube replacement, and personally transported her there that day.

24. Whitesburg ARH refused to admit Ms. Breech or replace the tube, because the stoma had by then begun to close during the hours she had been left without a tube or placeholder device. Wanting to avoid surgery if possible, Mr. Lusher promptly took Ms. Breech to Meadowview Regional Medical Center, where, with persistence, the treating emergency room provider -- a personal acquaintance of Mr. Lusher's -- was able to successfully replace the tube. Ms. Breech was also confirmed at Meadowview to have a urinary tract infection, subsequently identified as multi-drug-resistant E. coli.

25. Upon Ms. Breech's return to the Facility, a Facility nursing supervisor apologized to Mr. Lusher and acknowledged that the PEG tube incident had occurred as described.

26. In a conversation between Mr. Lusher and the Facility nursing supervisor, the supervisor stated that she herself had not been told of the incident until Mr. Lusher discovered it ("I had just found out when you found out is when I found out about the tube deal"), and explained that the nurse who found Ms. Breech's dislodged PEG tube reasoned that, because Ms. Breech was "on a calorie count" and eating adequately by mouth, it would "be okay" not to escalate the missing feeding tube. The supervisor stated that this reasoning "does not make it okay whatsoever," and that Mr. Lusher "should have been notified."

27. Facility staff represented that antibiotic treatment for the urinary tract infection would begin on August 20, 2025. As of August 21, 2025 - more than 24 hours later - Ms. Breech had still not received the antibiotic. On August 22, 2025, the culture and sensitivity report confirmed that the antibiotic class the Facility had by then started was not effective against the E. coli organism identified, and that the Facility's attending physician had proposed an antibiotic to which Ms. Breech had a documented allergy.

28. When advised that intravenous antibiotics and hospital admission were needed, Facility nursing staff reported that the Facility's attending physician had initially refused to call the receiving hospital to arrange Ms. Breech's admission. Mr. Lusher advised that he was willing to take Ms. Breech to the hospital, but only if the physician would first call ahead to arrange admission, since the Whitesburg ARH provider had already refused to admit her

days before and Mr. Lusher did not want Ms. Breech to wait unnecessarily in an emergency room for nothing. Facility staff then contacted Facility Administrator Jessica Hall, who told Mr. Lusher she would try to secure the physician's cooperation, and shortly thereafter reported back that the physician had agreed to call ahead.

29. Despite these representations, upon Ms. Breech's arrival at the emergency room, staff there advised that they had heard nothing from the Facility's physician. Mr. Lusher again called Ms. Hall, who again represented that the physician had promised to call the hospital; the physician still did not do so. The emergency room provider, having received no advance arrangement, was willing only to observe Ms. Breech and administer Rocephin -- an antibiotic she had already received repeatedly, raising concerns about antibiotic resistance, and one that would not provide coverage against the anaerobic bacteria implicated in the peritonitis risk created by her PEG tube having been left dislodged for an extended period. Concerned by both the resistance issue and the inadequate coverage, Mr. Lusher instead took Ms. Breech to Holzer Hospital in Jackson, Ohio, a more comprehensive facility with, in Mr. Lusher's assessment, better staffing levels. Given her age and clinical presentation, Holzer admitted Ms. Breech without Mr. Lusher having to request it, and its providers selected the intravenous antibiotic Meropenem, chosen to address both the E. coli urinary tract infection and the risk of peritonitis from the prolonged loss of the PEG tube.

### *C. The August 22, 2025 Refusal to Readmit Ms. Breech*

30. On August 22, 2025 (a Friday), Ms. Breech was admitted to Holzer Hospital for the reasons described in Section IV.B above.

31. On August 25, 2025, Ms. Breech was discharged from Holzer Hospital, and Mr. Lusher brought her back to the Facility. Upon arrival, Facility staff refused to unlock the doors and allow Ms. Breech to return to her room, telling Mr. Lusher that Facility Administrator Jessica Hall had instructed them not to let Ms. Breech in. Mr. Lusher and Ms. Breech - an incapacitated 88-year-old woman - were left outside the Facility, exposed to summertime mosquitoes, and in bewilderment as to the denial of access, as a result.

32. Defendants did not, at the time of the August 25, 2025 refusal of entry, or at any time thereafter, provide Ms. Breech or Mr. Lusher with written notice identifying a permissible

ground for transfer or discharge, an effective date, or the appeal and Ombudsman-contact information required by law and described in Count III below.

33. Later that day, on his way back to West Virginia, Mr. Lusher contacted Kentucky State Police to report the situation.

34. On August 25, 2025, Facility Administrator Jessica Hall texted Mr. Lusher asking where Ms. Breech was and why she had left Whitesburg ARH. Mr. Lusher responded the same evening, by text message, describing - among other things - that the Facility had "four staff members on record refusing to allow her in," with "no access to: thickener, meds, personal belongings, etc.," "despite the month already being paid for," and characterizing the situation as "a patient dumping situation." Mr. Lusher also called the Facility that same evening to again raise the lack of access to medications, feeding tube supplies, thickener, and personal belongings including Ms. Breech's wheelchair and newly fitted ankle brace; the call was placed on hold, disconnected, and not returned.

***D. Denial of Access to Medications, Medical Supplies, and Personal Belongings***

35. Ms. Breech is dependent on a PEG (percutaneous endoscopic gastrostomy) feeding tube for supplemental nutrition and requires thickened liquids due to dysphagia.

36. Notwithstanding this dependency, Mr. Lusher's August 25, 2025 message to Facility Administrator Jessica Hall documents that the Facility refused Ms. Breech and Mr. Lusher access to her feeding tube supplies, her thickener, her medications, and her personal belongings, even though the Facility had already been paid for the relevant period.

37. Despite Mr. Lusher's repeated written and verbal requests, the denial of access to Ms. Breech's medications, feeding tube supplies, thickener, and personal belongings continued for weeks following her August 22, 2025 hospitalization.

38. Upon information and belief, the Facility retained possession of Ms. Breech's personal belongings - including, without limitation, clothing and other personal effects reflected on the Facility's own Personal Inventory List, as well as her wheelchair and a recently fitted ankle brace - and refused Mr. Lusher's requests for access to and return of those belongings.

***E. The Facility's Continued Silence in the Face of Written Demand***

39. On September 10 20205, or shortly before, Mr. Lusher sent Facility Administrator Jessica Hall an additional written message regarding Ms. Breech's status, to which Ms. Hall did not respond.

40. On September 11, 2025, Mr. Lusher sent Ms. Hall a further written message, stating that she had "failed to respond to the text on 8/25, showing no concern for her, her access to her belongings, etc.," that the situation had "continued for weeks since then," and that Ms. Hall had "yet to respond to yesterday's message too."

41. In that same September 11, 2025 message, Mr. Lusher expressly invoked 42 C.F.R. § 483.15, stated that "[t]he law is very clear, a patient comes back to their bed, it's not something you can try to lock them out," and demanded a "simple yes or no" answer as to "are you allowing her back in her bed??" Mr. Lusher signed the message "Lois Breech's Grandson."

42. Upon information and belief, Defendants did not provide Mr. Lusher a clear, written "yes or no" answer to that demand, and did not readmit Ms. Breech to the Facility.

43. As of September 11, 2025 - three weeks after Ms. Breech was denied entry into the Facility, Defendants had provided no written notice of any permissible ground for refusing to readmit her, no appeal rights, and no clear communication regarding her status, despite Mr. Lusher's repeated written requests.

### *F. Billing for "Bed Hold" While Refusing Readmission*

44. Upon information and belief, notwithstanding Defendants' refusal to readmit Ms. Breech, Defendants continued to bill for, or represented that they were entitled to bill for, her stay at the Facility as "bed hold" days during at least part of the period she was excluded from the Facility.

45. Billing for a resident's bed as "held" while simultaneously refusing to readmit that resident when she was ready and eligible to return is inconsistent with the purpose of a bed-hold policy under 42 C.F.R. § 483.15(d)-(e), which exists to preserve - not defeat - a resident's right to return to her bed.

### *G. The Administrative Appeal and the Facility's Own Representation That No Discharge Was Contemplated*

46. Ms. Breech, through separate counsel, pursued an administrative appeal of Defendants' conduct before the Kentucky Cabinet for Health and Family Services, Office of Inspector General, which was forwarded to the Office of the Attorney General, Office of Administrative Hearings, Health Services Division, on September 3, 2025.

47. In that proceeding, counsel for the Facility represented that the Facility "does not intend nor has it contemplated the discharge of" Ms. Breech, and that no Discharge Notice had been issued to her.

48. On September 8, 2025, the assigned Administrative Law Judge entered a Final Order dismissing the administrative appeal, reasoning that, in the absence of an issued Discharge Notice or a contemplated discharge, there was no controversy ripe for adjudication under 900 KAR 2:050 or 42 C.F.R. § 483.15. The Final Order expressly noted that "[t]he parties may take issue with one another regarding other matters relative to this Appellant, and some of those issues may be legally actionable," but that such other issues were "beyond the scope" of that administrative appeal, and further noted that dismissal did not bar the Facility from later issuing a legally compliant discharge notice.

49. Notwithstanding the Facility's representation to the Administrative Law Judge that it did not intend and had not contemplated discharging Ms. Breech, and notwithstanding the absence of any Discharge Notice, Defendants did not return Ms. Breech to the Facility in the days and weeks following entry of that Final Order, consistent with the pattern of exclusion described in Sections IV.C through IV.E above.

50. Upon information and belief, Ms. Breech's continued exclusion from the Facility caused her to lose significant financial protections associated with her certified bed at the Facility.

51. Following Defendants' unlawful exclusion of Ms. Breech and their subsequent failure ever to provide a clear, written commitment to her lawful readmission despite Mr. Lusher's repeated demands, Mr. Lusher returned Ms. Breech to West Virginia, where she resided with him for a period before going to a different provider, and has subsequently resided at several different facilities. Ms. Breech has not resided at, or been readmitted to, the

Defendants' Facility at any time since Defendants' initial refusal of entry on August 25, 2025.

52. Defendants' unlawful exclusion of Ms. Breech without any stated ground or process, and their subsequent failure, despite repeated written demand, ever to provide a clear and lawful commitment to her readmission, left no safe or lawful path by which she could return to the Facility -- particularly against the backdrop of the documented care failures described in Sections IV.A and IV.B above.

**COUNT I - NEGLIGENCE (FAILURE TO TIMELY ADDRESS AND TREAT MS. BREECH'S DISLODGED FEEDING TUBE) (Against All Defendants)**

53. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

54. This Count is directed solely at Defendants' negligent mismanagement of Ms. Breech's dislodged PEG feeding tube and related antibiotic care between August 17 and August 22, 2025, as described in Section IV.B above. It does not encompass, and Plaintiff does not bring an independent claim based on, the falls, weight fluctuations, or other conditions described in Section IV.A above, which are alleged solely as context for the reasonableness of the family's engagement with the Facility.

55. Defendants owed Ms. Breech a duty to exercise the degree of care and skill expected of a reasonably competent long-term care facility and nursing staff, including a duty to timely assess and address a dislodged PEG feeding tube, to take reasonable measures to preserve the patency of the resulting stoma pending replacement, to timely notify her attending physician and her responsible party, and to timely and appropriately treat the infection that resulted.

56. Defendants breached that duty by, among other things: failing to treat Ms. Breech's dislodged PEG tube as requiring prompt medical attention notwithstanding two failed bedside replacement attempts on August 17 and 18, 2025; electing to defer physician notification until "early am" rather than seeking immediate guidance; failing to take any measures reflected in the record to preserve the patency of the open stoma between attempts; failing to notify Mr. Lusher, her Power of Attorney and responsible party, for

approximately two days after the tube first became dislodged; and, once the resulting infection was identified, failing to timely administer an effective antibiotic and instead proposing an antibiotic to which Ms. Breech had a documented allergy.

57. As a direct and proximate result of Defendants' breach, the stoma had closed to the point that the first receiving hospital, Whitesburg ARH, refused to replace the tube, requiring Ms. Breech to be taken to a second hospital, Meadowview Regional Medical Center, for a more involved procedure; Ms. Breech went without adequate nutritional support and suffered pain and physical discomfort from the open, untreated stoma and subsequent infection; and she required additional hospitalization at a third facility, Holzer Hospital, along with antibiotic treatment, that a timely response would have avoided or minimized. The hydration issues, pain and physical discomfort and infections relating to the stoma site have continued and remain ongoing since the Defendants' failure to promptly and properly address the PEG tube / stoma issue in August, 2025.

58. As a further direct and proximate result of Defendants' negligence, Ms. Breech suffered physical pain and suffering. Plaintiff seeks compensatory damages for that pain and suffering, together with any additional medical expenses incurred as a result of Defendants' negligence, in an amount to be proven at trial.

## COUNT II - WRONGFUL LOCKOUT / UNLAWFUL EXCLUSION FROM THE FACILITY (Violation of KRS 216.515 and 42 C.F.R. § 483.15) (Against All Defendants)

59. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

60. KRS 216.515(4) provides that a resident of a long-term-care facility "shall be transferred or discharged only for medical reasons, or [her] own welfare, or that of the other residents, or for nonpayment," and that "[r]easonable notice of such action shall be given to the resident and the responsible party or . . . responsible family member."

61. 42 C.F.R. § 483.15(e)(1) requires that, when a resident's hospital stay exceeds the facility's bed-hold period, the facility must readmit her to the first available appropriate bed if she still requires the services the facility provides, unless the facility validly determines she

cannot be readmitted and, in that event, complies with the transfer/discharge notice and appeal procedures of 42 C.F.R. § 483.15(c).

62. Defendants violated these provisions by physically refusing, on August 25, 2025, to unlock the Facility's doors and admit Ms. Breech when she was brought there by Mr. Lusher immediately following her hospital discharge, on the personal instruction of Facility Administrator Jessica Hall, without any permissible ground, notice, or process; and by refusing, in response to Mr. Lusher's repeated written demands over the weeks that followed, ever to provide any lawful notice, reason, appeal rights, or clear commitment to her readmission -- leaving Ms. Breech unable to access her bed, her medications, her medical supplies, and her belongings, as described herein.

63. This exclusion occurred notwithstanding that Ms. Breech's stay had already been paid for, and notwithstanding that Defendants continued to represent that they were entitled to bill for her bed as held, as described in Section IV.F above.

64. KRS 216.515 provides Ms. Breech a private cause of action for actual and punitive damages together with reasonable attorney's fees and costs. The conduct described in this Count also constitutes negligence per se under Kentucky law by reason of Defendants' violation of 42 C.F.R. § 483.15, a regulation enacted to protect residents such as Ms. Breech from precisely this type of unlawful exclusion from the Facility.

65. As a direct and proximate result of Defendants' wrongful lockout, Ms. Breech suffered the damages described herein.

## COUNT III - WRONGFUL AND CONSTRUCTIVE DISCHARGE (Violation of KRS 216.515 and 42 C.F.R. § 483.15) (Against All Defendants)

66. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

67. 42 C.F.R. § 483.15(c) permits facility-initiated transfer or discharge only on narrow, enumerated grounds, and requires written notice before any transfer or discharge -- generally at least thirty days in advance -- stating the reason, the effective date, and the resident's appeal rights.

68. Defendants' willful conduct -- unlawfully refusing Ms. Breech entry on August 25, 2025, and thereafter refusing, despite Mr. Lusher's repeated written requests, ever to provide any clear commitment to her readmission -- left Ms. Breech unable to be in the Facility during all the time since, as described in Section IV.G above.

69. This conduct constitutes a constructive if not actual discharge of Ms. Breech from the Facility: a de facto termination of her residency accomplished without any of the substantive or procedural safeguards KRS 216.515(4) and 42 C.F.R. § 483.15(c) require for a discharge.

70. Defendants' failure to ever issue the required notice also deprived Ms. Breech of any meaningful opportunity to appeal the basis for her exclusion, a right rendered illusory where, as here, Defendants never articulated a basis at all. Ms. Breech was ultimately forced to pursue a separate administrative appeal, described in Section IV.G above, in an effort to obtain a ruling on her right to return; that appeal was dismissed without reaching the merits after Defendants' own counsel represented that no discharge was contemplated -- a representation Defendants' own subsequent conduct is inconsistent with.

71. Defendants' conduct as described in this Count violates KRS 216.515(4), and constitutes negligence per se under Kentucky law by reason of the violation of 42 C.F.R. § 483.15(c), both of which were enacted to protect residents such as Ms. Breech from involuntary, unexplained, and unappealable termination of their residency.

72. As a direct and proximate result of Defendants' wrongful and constructive discharge of Ms. Breech, she suffered the damages described herein, including, but not limited to, the loss of what she had come to know as home.

## COUNT IV - BREACH OF CONTRACT (Against All Defendants)

73. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

74. Ms. Breech and/or Mr. Lusher, on her behalf, and Defendants entered into a written admission agreement governing the terms of Ms. Breech's residency at the Facility,

including the terms under which she could be transferred or discharged and the terms of the Facility's bed-hold policy.

75. Defendants breached the admission agreement by, among other things, refusing to readmit Ms. Breech without following the agreement's required notice and procedural protections; refusing her and Mr. Lusher access to her medications, medical supplies, and personal belongings during a period for which the Facility had already been paid; and billing for "bed hold" days while simultaneously refusing to honor Ms. Breech's corresponding right to return to her bed.

76. As a direct and proximate result of Defendants' breach, Plaintiff has sustained damages, including but not limited to amounts paid to Defendants for care and bed-hold services not honored, and other consequential damages to be proven at trial.

**COUNT V - CONVERSION (Against All Defendants)**

77. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

78. Ms. Breech held legal title to and the right to immediate possession of her personal belongings at the Facility, including without limitation the items reflected on the Facility's Personal Inventory List.

79. On multiple occasions since August 25, 2025 -- including in his August 25, 2025 and September 11, 2025 written communications to Facility Administrator Jessica Hall -- Mr. Lusher, on Ms. Breech's behalf, has demanded access to and return of those belongings.

80. Defendants wrongfully exercised dominion and control over Ms. Breech's personal belongings in denial of, and inconsistent with, her rights of ownership and possession, by refusing to permit access to or return of those belongings following demand.

81. As a direct and proximate result of Defendants' conversion, Ms. Breech was deprived of the use of her personal property and suffered damages in an amount to be proven at trial.

**COUNT VI - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against All Defendants)**

82. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

83. Defendants' conduct - including physically refusing to unlock the Facility's doors and admit an incapacitated, dementia-afflicted 88-year-old resident who had been brought to the Facility by Mr. Lusher for the specific purpose of returning her to her room, on the personal instruction of Facility Administrator Jessica Hall; excluding her from the Facility without lawful basis or notice; denying her and Mr. Lusher access to her prescribed medications, feeding tube supplies, and thickener for weeks; refusing Mr. Lusher access to her personal belongings notwithstanding that her stay had already been paid for; and willfully refusing, for weeks, to respond to Mr. Lusher's repeated, specific, written requests for information regarding her status - was intentional or, at a minimum, reckless.

84. Defendants' own nursing supervisor acknowledged, in a recorded conversation, that Facility staff's failure to promptly address Ms. Breech's dislodged PEG tube and to notify Mr. Lusher "does not make it okay whatsoever" -- a contemporaneous admission that Facility staff's own conduct fell outside the bounds of acceptable care.

85. This conduct was so outrageous and intolerable as to offend generally accepted standards of decency and morality, satisfying the standard for the tort of outrage recognized in *Craft v. Rice,* 671 S.W.2d 247 (Ky. 1984), and its progeny.

86. As a direct and proximate result of Defendants' conduct, Ms. Breech and Mr. Lusher suffered severe emotional distress.

**COUNT VII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (Against All Defendants)**

87. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

88. Defendants owed Ms. Breech and Mr. Lusher a duty of reasonable care in effecting any transfer or discharge, including reasonable care to avoid causing emotional harm through an

unexplained, unlawful exclusion from her residence and denial of access to her necessary medical supplies.

89. Defendants breached that duty in the manner described above.

90. As a direct and proximate result of Defendants' breach, Ms. Breech suffered a severe or serious emotional injury, within the meaning of Osborne v. Keeney, 399 S.W.3d 1 (Ky. 2012).

**COUNT VIII - RESIDENT ABUSE, NEGLECT AND DEPRIVATION OF SERVICES (Against All Defendants)**

91. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

92. The aforesaid acts and omissions of the Defendants, acting through Defendants' agents, employees, and representatives, constitute nursing home resident abuse, neglect and deprivation of necessary services, including but not limited to denied access to medications, medical and physical services and medical equipment including Plaintiff's wheelchair, all in violation of Kentucky Revised Statutes Chapter 216 and other applicable law.

93. As a direct and proximate result of these actions of the Defendants, the Plaintiff sustained mental and emotional suffering, physical pain and financial loss.

**COUNT IX - PUNITIVE DAMAGES (Against All Defendants)**

94. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

95. Defendants' conduct - including their negligent, multi-day failure to address Ms. Breech's dislodged feeding tube; their sustained, written-demand-ignoring refusal to readmit an

incapacitated resident or provide her access to her medications and personal belongings, despite express, written notice from Mr. Lusher invoking the applicable federal regulation; the physical refusal to unlock the Facility's doors to her on the Administrator's direct instruction; and their continued exclusion of Ms. Breech notwithstanding their own counsel's representation to a state administrative tribunal that no discharge of Ms. Breech was contemplated - was carried out with flagrant indifference to Ms. Breech's rights and safety, of a character sufficient to support an award of punitive damages under KRS 411.184.

96. Plaintiff is entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants and deter similar future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lois Breech, by and through her Attorney-in-Fact, CB Lusher, respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, as follows:

A. Compensatory damages in an amount to be determined at trial, not less than $3,045,000.00.

B. Punitive damages pursuant to KRS 411.184 in amount not less than $3,000,000.00

C. Reasonable attorney's fees and costs pursuant to KRS 216.515;

D. Pre-judgment and post-judgment interest as allowed by law;

E. Costs of this action;

F. A **trial by jury;** and

G. Such other and further relief as this Court deems just and proper.

/s/ Edward L. Cooley
Edward L Cooley
ed@cirlegal.com
Rhonda Nicole Iuliano
nicole@cirlegal.com
Michael Ryan Robey
ryan@cirlegal.com
COOLEY IULIANO ROBEY, PLLC
201 West Short Street, Suite 500
Lexington, KY 40507
Telephone: (859) 258-2697
Facsimile: (859) 402-0296

*Counsel for Plaintiff*